# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# HARRISONBURG DIVISION

| | |
|---|---|
| Tamela Kiser,<br>5218 Witmer Lane<br>Dayton, VA 22821<br><br>*Plaintiff*,<br><br>v.<br><br>Rachel Gaghan,<br>Former Director – Suitcase Clinic,<br>James Madison University,<br>1260 Cottage Ln<br>Rockingham, VA 22801-3867<br><br>And<br><br>Melody Eaton,<br>Director of the AUH School of Nursing,<br>James Madison University,<br>13368 Turleytown Rd<br>Broadway, VA 22815-2524<br><br>And<br><br>Linda Plitt-Donaldson,<br>Associate Dean, College of<br>Health & Behavioral Studies,<br>Director, The Institute for Innovation in<br>Health & Human Services Professor of<br>Social Work**,**<br>James Madison University,<br>1135 Sumter Ct<br>Harrisonburg, VA 22802-5628<br><br>Each Sued Individually – in Their<br>Personal Capacities,<br><br><br>*Defendants*. | Case No. 5:23-cv-00055<br><br><br>**JURY TRIAL DEMANDED** |

1

## COMPLAINT

Plaintiff, Tamela ("Tammy") Kiser ("Plaintiff" or "Ms. Kiser" or "Dr. Kiser"), brings this action under the First and Fourteenth Amendments to the U.S. Constitution, *see* 42 U.S.C. §1983, and alleges as follows:

## INTRODUCTION AND NATURE OF THE CASE

1. In and after September 2021, Defendants – under color of state law – undertook wrongful actions towards Plaintiff with the goal of a.) silencing her opinions relating to the funding and management of the Suitcase Clinic and b.) of obstructing her ability to associate with employees, other volunteers, and patients treated through the Suitcase Clinic. This wrongful conduct by Defendants – under color of state law as employees of James Madison University – violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution. It also caused Plaintiff to suffer damage to and ultimately, the loss of her employment with James Madison University, to suffer damage to her reputation within the University and local communities, and to suffer significant emotional distress.

## JURISDICTION AND VENUE

2. This action arises under the First and Fourteenth Amendments to the U.S. Constitution and is brought via 42 U.S.C. §§1983 and 1988.

3. This Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343.

4. Venue is proper under 28 U.S.C. §1391 because the events giving rise to the claims occurred in this district and because the Defendants reside herein.

## PARTIES

5. Plaintiff Tamela Kiser, DNP, RN, previously served as a tenured Associate Professor of Nursing at the School of Nursing at Jamese Madison University.

6. Defendant Rachael Gaghan, R.N. ("Defendant Gagnon" or "Gagnon"), worked as Clinic Director, Healthcare for the Homeless Suitcase (i.e., "Suitcase Clinic") from approximately July 2021 until June 2022. In this role, Defendant Gaghan was an employee of James Madison University.

7. During the operative time frame, Defendant Melody Eaton ("Defendant Eaton" or "Eaton") served as Director of the AUH Schol of Nursing at James Madison University (and she continues to work in this position).

8. During the operative time frame, Defendant Linda Plitt-Donaldson ("Defendant Plitt-Donaldson" or "Plitt-Donaldson") served as Associate Dean, College of Health & Behavioral Studies, and Director of the Institute for Innovation in Health & Human Services, and Professor of Social Work at Jamese Madison University (and she continues to work in these positions).

## FACTS

9. Plaintiff (Dr. Kiser) has worked extremely hard over the years to pursue her education in the field of nursing. Dr. Kiser holds a BSN; an MS in Nursing/Nurse-Educator; an MSN Certificate, Public Health Nursing Administration; and a Doctor of Nursing Practice, Public Health Nursing Administration (which she was awarded in 2015). Since 2007, Plaintiff aught nursing students in JMU's School of Nursing, first as an Instructional Faculty member and later, beginning in 2015, as an Assistant Professor.

10. On October 27, 2020, Dr. Kiser was granted tenure status with JMU, at the rank of Associate Professor. The grant of tenure to Dr.. Kiser occurred only after a rigorous review and consideration process. The grant of tenure status to Dr. Kiser was a strong endorsement of her outstanding work performance, her devotion to duty and the profession of nursing, her education and scholarship, and her stellar reputation as a teaching member of the University's faculty.

11. In addition to her commitment to teaching nursing students, Dr. Kiser has a deep commitment and passion for helping the homeless with their healthcare needs.

12. In 2009, while teaching nursing students as a faculty member at Eastern Mennonite University, Dr. Kiser, along with a group of other community health nurses in the Harrisonburg, Virginia, area, realized that the homeless population in Harrisonburg had significant needs for basic healthcare services which were not being met.

13. In response, Dr. Kiser – and several other nurses who are highly committed to providing community health services - founded the Healthcare for the Homeless Suitcase Clinic ("Suitcase Clinic").

14. The mission of the Suitcase Clinic was – and remains – to provide critical, basic healthcare services to the homeless population in the Harrisonburg area, on a mobile basis. To deliver these services, one or more volunteers would go out to different parts of the city, including homeless shelters, with a mobile suitcase of medical supplies to provide healthcare services to the homeless.

15. Since its inception, Dr. Kiser played a pivotal leadership role for the Suitcase Clinic. She has promoted it; helped raise funds and donations of supplies for it; managed its operations as clinic coordinator; and delivered, in a hands-on way, critical healthcare services to its patients. In sum, no task has been too big or too small for Dr. Kiser, and she has donated countless hours of her own time – without compensation – to this effort. It has been, and remains, a labor of love for her and something that she feels deeply passionate about and committed to do. Through her own service, and the service of numerous other healthcare professionals and other volunteers, thousands of homeless patients have had their basic medical needs taken care of over the years.

16. In addition to the efforts described above, Dr. Kiser also did research for her own doctoral program through the Suitcase Clinic and further, while teaching at EMU and subsequently, at JMU, led between 500 to 1,000 senior-level nursing students through their clinical practicums by working at the Suitcase Clinic.

17. For several years, the Suitcase Clinic received logistical and operational support from JMU's Institute for Innovation in Health and Human Services ("IIHHS"), along with a number of other agencies and partners. All funding for the Suitcase Clinic came from grants, such as the Community Development Block Grant from the City of Harrisonburg and a grant from the RMH Foundation, as well as donations from other sponsors (mainly churches in the Harrisonburg area). The annual budget for the Suitcase Clinic in most years was around $120,000.

18. Although the Suitcase Clinic received certain logistical and operational support through the IIHHS, it was not legally owned by JMU or the IIHHS. Over the years, the Suitcase Clinic Coalition was an informal association of concerned persons who came together to meet the basic healthcare needs of the homeless population in Harrisonburg, and to also provide oversight and guidance for its operations.

19. Since the Suitcase Clinic was formed, Dr. Kiser regularly served as chair of its Coalition's meetings, and otherwise served in a leadership role within that group.

20. It would be hard to overstate the vital role that Dr. Kiser played in relation to the work of the Suitcase Clinic. Those who knew her well, to include peers at JMU and nursing students and others involved with the Suitcase Clinic, frequently referred to the Suitcase Clinic as "Tammy's baby." It is this extremely close association that Dr. Kiser had with the Suitcase Clinic that evoked the anger of the Defendants and, as explained herein, caused them to wrongfully conspire

to forbid Dr. Kiser from continuing to associate with the Suitcase Clinic, in violation of her rights under the United States Constitution.

21. As the Suitcase Clinic continued to receive the referenced logistical and operational support through the IIHHS, Dr. Kiser and others involved with the Suitcase Clinic became increasingly concerned with the level of bureaucracy that was developing through the policies of the IIHHS. In sum, she and others felt that the IIHHS was hindering the growth and success of the Suitcase Clinic, and her view on this issue was communicated to others.

22. To address this issue, the Suitcase Clinic Coalition formed a subcommittee to review whether the Clinic should stay with the IIHHS versus not, and other issues relating thereto. This subcommittee was formed in significant part because Dr. Kiser's views on this issue were already so well known (i.e., that the Suitcase Clinic should operate outside of the support that had been provided by the IIHHS).

23. A few months after this focused review by the referenced subcommittee began, Defendant Plitt-Donaldson was hired as Director of the IHHS at JMU. Immediately thereafter, Defendant Plitt-Donaldson called Dr. Kiser into a meeting and expressed anger to her for the ongoing effort to consider moving the Suitcase Clinic from the IIHHS. Defendant Plitt-Donaldson clearly knew Ms. Kiser's viewpoint concerning this issue, and that made her angry. Defendant Plitt-Donaldson opposed Dr. Kiser's viewpoint of having the Suitcase Clinic operate outside the logistical and operational support that the IIHHS had been providing because it was prestigious for the IIHHS (and for her, as its Director) to be able to claim that it was filling this role in support of the Clinic. Moreover, upon information and belief, the IIHHS benefited from playing this role from a staffing perspective, as it would need to use one or more staff members to help provide support to the Suitcase Clinic, the costs of which would be defrayed by grant

6

money which had been designated for the Clinic.  What Dr. Kiser did not realize at that time was just how deep Plitt-Donaldson's anger was towards her concerning her close, Constitutionally protected association with the Suitcase Clinic.

24. A few months later, Defendant Eaton had Dr. Kiser removed from the IIHHS Steering Committee, through which activities of the IHHS were discussed (which at times would include issues relating to the Suitcase Clinic).  While Defendant Eaton said that this was done (upon information and belief, at the request of Plitt-Donaldson) because she thought that Dr. Kiser had other committee(s) that she could work on at that point in her career, Dr. Kiser now believes that such was a pretext, in particular to hide Plitt-Donaldson's ongoing plan to separate Dr. Kiser from having any role in and associating with the Suitcase Clinic.

25. In November 2020, Dr. Kiser and others on the Suitcase Clinic leadership team were told by Plitt-Donaldson that they had to adhere to the IIHHS' Policy and Procedure Checklist and hire a Director for the Suitcase Clinic by April 2021. Dr. Kiser and the others on the leadership team immediately started working to comply with this Checklist, to include searching for additional funding to enable the Suitcase Clinic to hire a Director.

26. In April 2021, Dr. Kiser took a leading role in informing Defendant Plitt-Donaldson that they would not be able to hire a Director and that they could not meet the deadline that she had established.  Dr. Kiser also advised Plitt-Donaldson of the option to move the Suitcase Clinic from outside the purview of the IIHHS, and she further advised her that the Open Doors Shelter (a local 501(c)(3) nonprofit organization in Harrisonburg, with whom Dr. Kiser also served as a Board member) had offered to have the Suitcase Clinic come under its purview, to provide nonprofit status and support until the Suitcase Clinic could secure its own nonprofit status and otherwise begin to operate independently.

27. With the benefit of hindsight, it is clear to Dr. Kiser that Plitt-Donaldson was very angry about this and that this further contributed to her motivation to separate Dr. Kiser from the Suitcase Clinic.

28. All of the aforementioned efforts on the part of Dr. Kiser in relation to the Suitcase Clinic, to include her involvement in reviewing the issue of whether the Clinic should continue to receive support from the IIHHS or not, as well as her efforts (and that of others) to try and hire a Director, were undertaken in her personal capacity and not as a faculty member of JMU. In sum, this work was not part of her job description, or otherwise part of her duties as a member of the faculty of the JMU School of Nursing. Rather, it was voluntary, associational activity on her part that was protected by the First Amendment of the United States Constitution.

29. Consistent with the plan developed to separate the Suitcase Clinic from the IIHHS, the Suitcase Clinic registered as its own nonprofit corporation in Virginia on May 27, 2021, as the Healthcare for the Homeless Suitcase Clinic, Inc.

30. At or near that time, Defendant Plitt-Donaldson and Defendant Eaton developed a plan to contribute monies from the School of Nursing to hire a part-time clinic director for a period of six months. To that point in time, JMU and the IIHHS had not provided money from its own funds for the operations of the Suitcase Clinic – rather, they had only provided in-kind support such as the use of office space and some financial oversight. While it was not clear to Dr. Kiser at the time, she now believes that Defendants Plitt-Donaldson and Eaton conspired in developing this plan for the purpose of separating Dr. Kiser from her associational activity and support of the Suitcase Clinic.

31. In July 2021, Defendant Gaghan was hired by the IIHHS to serve as the Director of the Suitcase Clinic. Dr. Kiser had approximately five direct interactions with Defendant Gaghan

after she was hired as the Director for the Clinic. From Dr. Kiser's perspective, these interactions were cordial, and Dr. Kiser actively lent support to Gaghan and the effort to help her succeed in her newly created role.

32. On September 10, 2021, Dr. Kiser was summoned to a meeting with Defendant Eaton and Defendant Plitt-Donaldson, at which she was presented a Memorandum, with the subject line: "Professional Behaviors Related to Healthcare for the Homeless Suitcase Clinic." Dr. Kiser asked Defendant Eaton why Plitt-Donaldson was there, because Plitt-Donaldson was not a supervisor for Dr. Kiser. Defendant Eaton responded that Plitt-Donaldson was there as a representative for the Suitcase Clinic.

33. Through this Memorandum, Defendant Eaton ordered Ms. Kiser to:

"Effective immediately, **you will stop participating in any and all activities related to the Healthcare for the Homeless Suitcase clinic**. You are also being removed from your role of Clinical Coordinator for NSG 453L effective immediately. This is directly due to a pattern of professional behavior concerns linked to your involvement with the Healthcare for the Homeless Suitcase Clinic. (Emphasis added).

34. When she heard this, and first saw this Memorandum, Ms. Kiser was stunned and in shock. She could not believe what she was hearing and reading. She asked Defendant Eaton if she was being fired, to which Eaton responded that she was not being fired, but that if she did not comply with their directives, then further steps would be taken.

35. Dr. Kiser also asked who it was that had made the allegations referenced in the Memorandum. Defendant Eaton responded that "we cannot talk about that now," or words to that effect. Dr. Kiser continued to question how she could possibly respond to the allegations in the Memorandum if she was not told who had made such allegations. Defendant Eaton responded that they could not talk about that now, but asserted that she had "talked to people" or words to that effect. At or after this time, Defendant Eaton, as well as Defendant Gagnon (and

9

Emily Akerson, Associate Director for JMU's Institute for Innovation in Health and Human Services) also instructed at least two other employees of JMU who provided services to the Suitcase Clinic and who had first-hand knowledge of Dr. Kiser's work on behalf of the Clinic not to talk email, talk to, or otherwise communicate with her, or words to that effect. This conduct was wrongful, and it further serves to demonstrate the violation of Dr. Kiser's associational rights, and, as further explained in Paragraph 40, *infra*, also served to obstruct Dr. Kiser's ability to potentially challenge the decisions reflected in the September 10, 2021 Memorandum, through JMU's grievance process.

36. Just 11 months after she was granted tenure as a faculty member with the School of Nursing, Ms. Kiser was suddenly being accused of engaging in, among other things, acts of:

- dishonesty
- undermining the new Director of the Suitcase Clinic;
- attempting to manipulate the hiring process for the Director position;
- uncivil verbal and written communications with IIHHS leaders;
- not ensuring compliance of the Suitcase Clinic with the IIHHS checklist;
- purchasing items outside of JMU policy; and
- operating a clinic without clear written policies.

37. Moreover, through this Memorandum, Ms. Kiser was accused of the following:

"**General lack of transparency. Working behind the scenes to disrupt and remove Suitcase Clinic services from the university**." (Emphasis added).

38. Prior to this meeting, Dr. Kiser had never been disciplined by JMU. She had never been counseled, much less warned, of any purported performance or conduct problem. Indeed, less than 11 months earlier, Dr. Kiser was granted tenure status and was hailed as having performed

10

"stellar service" to that point in time. Yet now, despite her years of outstanding service to the JMU School of Nursing, Dr. Kiser was being ordered to stop "any and all activities related to the Healthcare for the Homeless Suitcase clinic", purportedly based upon allegations from a person she was not permitted to know about, and the substance of which she was not being permitted to challenge or even discuss.

39. These allegations were completely false. While Dr. Kiser did not realize it at the time, it is now clear to her that these allegations were manufactured as a pretext for the Defendants to violate Dr. Kiser's Constitutional rights and prevent her from continuing to associate with the Suitcase Clinic and work to support its vital mission.

40. Unbeknownst to Dr. Kiser at the time (because her request to Defendant Eaton to identify the person who had made the allegations against her was denied), these allegations stemmed from allegations in an email from Defendant Gaghan of September 2, 2021, to Defendant Eaton. Dr. Kiser was only able to discover this months later, after she submitted a Freedom of Information Request to JMU through her counsel. Defendant Gaghan's email and other documents material to Dr. Kiser's wrongful and illegal treatment were not provided to Dr. Kiser (and her counsel) until April 1, 2022. This timing was critical. Under JMU's grievance process applicable to instructional faculty members, a grievance had to have been filed by Dr. Kiser within six months of the decision or action to be challenged which in this instance, was the Memorandum issued to Dr. Kiser on September 10, 2021. Because Dr. Kiser only learned the identity and details of Defendant Gaghan's false allegations against her after the information was provided on April 1, 2022, she was no longer able to file a grievance through JMU's grievance system. Dr. Eaton's refusal to identify who had made the allegation against her, when Dr. Kiser had asked for such information, directly caused this prejudice to Dr. Kiser.

41. This email contained numerous false allegations of fact against Dr. Kiser which were defamatory and harmful to her reputation. Among others, through this email, Defendant Gaghan revealed the true motivation at issue through these statements:

> "I attended a lunch with Tammy early in my experience and she stated that her plan to detach the Suitcase Clinic from JMU was confidential and I can't involve anyone from JMU leadership. I then tried to bring concerns about the clinic's governance to leadership while protecting that confidence, but it appeared to be common knowledge once those conversations began. When I chose the transparency I found out quickly that EVERYONE in leadership was aware that Tammy is actively trying to separate the Suitcase Clinic from JMU and no one has done anything to truly confront the issue for a number of years."

42. Any purported doubt about the real motivation behind Defendant Gaghan's false allegations is negated through the fact that after this situation developed, in relation to the allegations that she had made against Dr. Kiser and the impact of same upon her, Gaghan told two other JMU employees who provided service to the Suitcase Clinic that she "realized now why she was brought in, to do the job she was doing, and she realized it was to get rid of Tammy", or words to that effect. Defendant Gaghan's statements demonstrate that she had become part of the ongoing wrongful conspiracy, which originated with Defendants Plitt-Donaldson and Eaton, to separate Dr. Kiser from her associational activities with the Suitcase Clinic.

43. Dr. Kiser's activities on behalf of the Suitcase Clinic – other than supervising nursing students in their clinical practicums conducted therein – were voluntary, Constitutionally protected associational activities on her part. Moreover, when Dr. Kiser expressed her opinion, on various occasions, that she believed it was best for the Suitcase Clinic to not continue to receive logistical and operational support from the IIHHS (as it had previously done), she exercised her right to engage in free speech, which was protected by the First Amendment of the Constitution. The Defendants trampled on those rights when they (i.e., Defendants Eaton and

12

Plitt-Donaldson, based upon the false statements manufactured by Defendant Gaghan) ordered her to immediately "**stop participating in any and all activities related to the Healthcare for the Homeless Suitcase clinic**."

44. The pretextual nature of the false allegations at issue is clear. Defendants Eaton and Plitt-Donalson not only did not ask Dr. Kiser if the allegations against her were true or not, but they also (through Eaton) expressly denied her request to reveal who had made the allegations against her and to substantively discuss such allegations. Upon information and belief, they did this because they knew the allegations brought forward by Defendant Gaghan were manufactured and false, and they were conspiring against Dr. Kiser to separate her from her associational activities with the Suitcase Clinic.

45. The pretextual nature of these false allegations is also demonstrated through the fact that Defendant Gaghan and/or Defendant Plitt-Donaldson also apparently relied upon purported "observations" about alleged behavior by Dr. Kiser in relation to the Suitcase Clinic, which were apparently not written down until November 20, 2020 (i.e., months and in certain cases, years after such allegedly occurred, and also nearly one year before the pivotal meeting of September 10, 2021). Despite the fact that someone purportedly wrote down these "observations" about alleged improper conduct and behavior by Dr. Kiser, they were never mentioned to her until about 10 months later, through Memorandum of September 10, 2021. Once again, Dr. Kiser was not able to discover this until several months after she was ordered to stop "any and all activities" relating to the Suitcase Clinic.

46. This wrongful conduct by the Defendants caused significant damage to Dr. Kiser. As a result thereof, she was deeply embarrassed, and her reputation amongst the nursing students, her peers at the Suitcase Clinic, her peers amongst the faculty in the School of Nursing, and others

within the community with whom she had long dealt on behalf of the Suitcase Clinic was severely damaged. Moreover, Dr. Kiser's career as a faculty member at JMU was also irreparably damaged, as Defendant Eaton immediately removed Dr. Kiser from serving any role in relation to the Suitcase Clinic and leading nursing students through their practicums therein.

47. Dr. Kiser's specialized area of focus, to include ongoing research, was in the field of community health nursing. Dr. Kiser had specialized in this area of scholarship for several years, and in 2016, she was recognized as the Public Health Nurse of the Year in Virginia by the March of Dimes. By removing Dr. Kiser from serving any role in relation to the Suitcase Clinic and as a coordinator in leading nursing students through their practicums therein, Dr. Kiser's ability to continue to progress in this area of specialized study and research was destroyed. Defendants Eaton and Plitt-Donaldson undoubtedly knew that, and undoubtedly intended for this and other harm to be inflicted upon Dr. Kiser through their wrongful actions towards her.

48. This wrongful conduct also caused significant emotional harm to Dr. Kiser, including but not limited to depression and extreme embarrassment. As a result thereof, for many months, she avoided going to the JMU campus and the School of Nursing, except to the extent such was absolutely required. At one point, Dr. Kiser told her BSN Program Coordinator that she was very uncomfortable going to faculty meetings because of what had been done to her, and she joined such meetings remotely as a result thereof. Her Program Coordinator responded that she understood why Dr. Kiser felt that way (i.e., because of what had occurred).

49. This wrongful conduct by the Defendants also caused harm to Dr. Kiser through the loss of enjoyment that she had experienced for more than 10 years through her countless hours of service to the Suitcase Clinic and the homeless population in the Harrisonburg area. The

wrongful conduct of the Defendants cut Dr. Kiser deeply, emotionally, to her core as a person, and she continued to suffer the harm from such.

50. Against this backdrop, while Dr. Kiser attempted to continue to work as an Associate Professor for the School of Nursing, her ability to work effectively in that role was severely damaged due to the harm that she suffered by the Defendants wrongful conduct. On a daily basis, she felt extreme embarrassment over what had been done to her, which never should have occurred, and as referenced above, her ability to continue to work in her specialized area of community health nursing was irreparably harmed. Despite her best efforts, Dr. Kiser's working conditions became intolerable and she resigned her position in August 2022. This was a constructive discharge, and not something that she would have voluntarily done, but for the wrongful conduct of the Defendants and the lasting harm that it caused upon her.

51. The facts referenced above demonstrate that the wrongful conduct of the Defendants was personal towards Ms. Kiser, and was undertaken with actual malice towards her and with reckless disregard for the truth and for her legally protected rights. Their conduct was based upon their conspiracy - common plan - and scheme to prevent Dr. Kiser from doing one of the things that she loved doing the most in her life: associating with and helping those in need through the Suitcase Clinic.

52. It is against this backdrop that Dr. Kiser is seeking justice through this lawsuit – she has no other choice, and no other forum through which to try and regain her reputation and good name, which she built over many years and countless hours of service to those in need.

**COUNT I**
**42 U.S.C. § 1983 - Violation of the First & Fourteenth Amendments**
**(Interference and Retaliation)**
**(All Defendants)**

15

53. Plaintiff repeats and realleges each of the prior allegations in Paragraphs 1 – 52 of this Complaint.

54. The First Amendment, as incorporated against the States by the Fourteenth Amendment, protects the freedoms of speech and association. *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986) (explaining and quoting, "The nature of appellees' First Amendment interest is evident. 'It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.'").

55. State actors "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests -- especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (Internal citation omitted).

56. The protected rights under the First Amendment also include the right of a person to be free from retaliation because she has exercised her right to free speech. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (explaining, "'The First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right.'") (Internal citation omitted). *Accord Rutan v. Republican Party of Ill.*, 497 U.S. 62, 78 (1990). Put simply, "[o]fficial reprisal for protected speech offends the Constitution." *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

57. The First Amendment is violated whenever speech, politics, or association motivated the retaliatory action "at least in part." *Cruise-Gulyas v. Minard*, 918 F.3d 494, 497 (6th Cir. 2019).

58. Plaintiff's deeply held beliefs concerning the vital nature of the mission of the Suitcase Clinic and how its operations should be carried out, her years of extensive association and support for the Suitcase Clinic, and her speech concerning such beliefs – including but not limited to her expressed opinion that the Suitcase Clinic should operate outside the parameters of the logistical and operational support that the IIHHS had been providing to it, are protected by the First Amendment. These rights were clearly established, and each of the Defendants knew that Dr. Kiser enjoyed these rights when they engaged in the wrongful conduct outlined above.

59. As explained above, including the facts set forth in Paragraphs 20 – 26, on multiple occasions, Dr. Kiser expressed her view that the Suitcase Clinic should not continue to operate with the logistical and operational support of the IIHHS. This occurred particularly in April 2021, when she told Defendant Plitt-Donaldson her view that the Suitcase Clinic should gain further support from, and fall within the purview of the Open Doors Shelter (a local non-profit organization for which she served as a Board member).

60. As outlined above, Dr. Kiser also devoted what must have been thousands of hours of her own time to help lead the effort to provide basic health care services to the homeless population in Harrisonburg, through the Suitcase Clinic. Dr. Kiser was so closely affiliated with the mission and operations of the Suitcase Clinic that it was commonly referred to as "Tammy's baby."

61. This conduct on the part of Dr. Kiser – which was protected under the First Amendment – angered the Defendants, and motivated them to engage in the aforementioned, conspiracy and other wrongful acts towards her, which violated and interfered with her Constitutionally protected rights and which retaliated against her for exercising such rights.

62. This resulted in the allegations against Dr. Kiser by Defendant Gaghan, which were false and pretextual, to hide the illegal motivation and plan on the part of the Defendants to separate Dr. Kiser from "any and all activities" relating to the Suitcase Clinic – which they did through the illegal Memorandum and directives given to her by Defendants Eaton and Plitt-Donaldson on September 10, 2021. Additional evidence of this conspiracy on the part of the Defendants is found in the conduct of Dr. Eaton, when she refused to identify the person who had made the allegations in question against her, in response to Dr. Kiser's request. Moreover, this wrongful conspiracy is demonstrated through the wrongful conduct of at least two of the Defendants – Eaton and Gaghan – when they instructed two other JMU employees who had critical knowledge of Dr. Kiser's years of service to the Suitcase Clinic, not to communicate with her. *See* Paragraphs 35, 40, *supra*.

63. The above-referenced acts of the Defendants to deprive Dr. Kiser of her protected, First Amendment rights, and to retaliate against her for exercising those rights, were perpetuated under color of state law. They were also wrongful and illegal, and they caused significant damage to Dr. Kiser. They were also undertaken by the Defendants with actual malice towards Dr. Kiser, and with reckless and callous disregard for her Constitutionally protected rights.

64. These wrongful acts by the Defendants caused significant damage and harm to Dr. Kiser, which includes economic harm and emotional distress and trauma. In sum, this wrongful conduct ruined Dr. Kiser's promising career as a faculty member of the JMU School of Nursing, including her ability to continue to teach there and advance in her specialized field of community health nursing, as well as her reputation therein. This conduct also caused Dr. Kiser to suffer significant emotional trauma and harm, and deep embarrassment for what had been done to her (without any reasonable justification). This wrongful conduct also resulted in the

loss of Dr. Kiser's employment with JMU, as she was deprived of the opportunity to timely file a grievance with JMU over this situation (because she was denied the critical information that she needed to make an informed decision on whether to do so), and through the constructive discharge that she endured in August 2021. It also deprived Dr. Kiser of her ability to enjoy and continue to associate with the Suitcase Clinic, which was incredibly important to her and something that she was deeply committed to continuing.

WHEREFORE, Plaintiff Tamela Kiser asks that judgment be entered in her favor and against Defendants, on a joint and severable basis, on Count I and for the following relief:

1. Finding that Defendants violated Plaintiff's rights under the First and Fourteenth Amendments of the United States Constitution;

2. Awarding Plaintiff and against Defendants, on a joint and severable basis, monetary damages for her lost wages (both to date and in the future) and other lost economic opportunities as a member of the faculty at the JMU School of Nursing, as well as all other employment benefits that she has lost, in excess of $750,000;

3. Awarding Plaintiff and against Defendants, on a joint and severable basis, compensatory damages, to include for emotional distress; damage to her reputation; and the deprivation of her right to continue to associate with and serve in support of the Suitcase Clinic, which she has suffered because of Defendants' wrongful and illegal conduct, in an amount to be determined at trial, in excess of $500,000;

4. Awarding Plaintiff and against Defendants, on a joint and severable basis, punitive damages in an amount to be determined at trial, in excess of $500,000;

5. Awarding Plaintiff and against Defendants, on a joint and severable basis, her reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988[b] (regarding attorneys' fees) and 28

U.S.C. § 1920 and Fed. R. Civ. Proc. 54(d) (regarding costs);

6. Awarding Plaintiff and against Defendants, on a joint and severable basis, pre- and post-judgment interest, at the applicable statutory rate; and

7. Awarding Plaintiff and against Defendants such further and additional relief, including equitable relief, as justice may require.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands trial by jury on all issues so triable.

DATED: August 30, 2023

                                        Respectfully submitted,

                                        TAMELA KISER

                                        By Counsel

*/s/ John B. Flood*

_____
Lee. E. Berlik (VSB #39609)
John Flood, Of Counsel, (VSB # 79813)
BERLIKLAW, LLC
1818 Library Street, Suite 500
Reston, Virginia 20190
Tel: (703) 722-0588
LBerlik@berliklaw.com
JFlood@berliklaw.com
*Counsel for Plaintiff*